CHARLES R. JOHNSON and CHARLOTTE M. JOHNSON, his Wife, *vs.* JOHN H. HEALD, Executor of JAMES FRAZIER.

*Construction of the Act of* 1868, *ch.* 116, *relating to the Competency of Witnesses and the Examination of Parties.*

In any suit, action or other proceeding, where an executor is a party, he may, under the Act of 1868, chapter 116, on his own offer, or on the call of his co plaintiff or co-defendant, give in evidence, adversely to his opponent, any conversation he may have had with the latter in reference to the cause of action or controversy when it antedates the death of the testator; and if he does so, then the other party likewise, on his own offer, or on the call of his co-plaintiff or co-defendant, may testify in respect to such conversations or admissions, by giving such evidence as will fairly tend to contradict, explain or modify them; but beyond this he cannot go.

Upon a bill filed by an executor to set aside certain gifts alleged to have been made by his testator, to a son and daughter, the executor was examined under the Act of 1864, chapter 109, on his own offer, and in the course of his examination, testified as to interviews and conversations between himself and the daughter, one of the donees. No interrogatory was put to this donee relative to those conversations, and no contradiction or explanation of them offered; she, however, became a witness on her own offer, and testified at large to the whole cause—to her father's mental condition and capacity to make the gift of railroad bonds—to the previous gift of the house and furniture—to the writing on the envelope in which the bonds were placed, and then gave a

detailed statement of all that occurred in reference to the secret gift of the bonds between herself and her deceased father, when no other person was present. She was not cross-examined, and her whole testimony was excepted to on the grounds of her incompetency as a witness. HELD:

That she was not competent to testify on any of these matters, and the exception to her testimony was well taken.

APPEAL from the Circuit Court of Baltimore City.

The bill of complaint in this case, filed on the 24th of September, 1866, by the appellee against the appellants, and Jas. M. Frazier and the Northern Central Railway Company, alleged that James Frazier died on the 18th of July, 1866, having made a will on the 23d of December, 1863, in manner and form to pass real estate, which was duly proven, and on which letters testamentary were granted to the complainant; that said Frazier died in the eighty-fifth year of his age, and although originally a man of much vigor of mind and body, he had become, in the last year or two of his life, exceedingly infirm, and this condition of feebleness gradually so increased that, towards the last, he was quite incapable of intelligent transaction of business—his senses were greatly impaired, and his memory shared the decay of his physical faculties. That more than a year before 'his death, he had sunk into a state of hopeless imbecility, and lost all power of managing or taking care of his property, or of resisting any influence which those by whom he was immediately surrounded might choose to exercise.

That at his death, and for two and a half years previously, his household consisted of his son, James M. Frazier and his wife, Elizabeth, and of his daughter Charlotte M. Johnson and her husband, Charles R. Johnson, a master mariner, but who, on his return from sea in the latter part of the year 1864, also lived with his wife, in the same house; and that upon the said son, James M., and the daughter, Charlotte and her husband, the care of his person and the possession of a very large amount of property devolved.

That although the said son and daughter were already greatly benefitted by the bounty of their father, who, while in health, had manifested no intention to give them a preference over persons having an equal claim, they availed themselves of their position—Charlotte being impelled thereto by her husband—to appropriate to themselves large portions of their father's property, when he was incapable of making a valid disposition of the same; and in order more effectually to get possession of his estate, the son, less than a year before his father's death, and when he was incapable of making a valid deed or contract, induced him to execute a power of attorney to him, under which he got into his possession large sums of money and valuable effects—part whereof he took to his own use, and another part, in execution of a mutual scheme and confederacy between himself and his sister Charlotte and her husband, he transferred to them, or one of them, and that Charlotte and her husband, with the connivance of the son, appropriated other property of their father to a still greater extent.

The bill then particularly charged that the testator owned in his life-time registered bonds of the Northern Central Railway Company to the amount of $10,000, standing in his name, and unregistered bonds of 1885, of the same company, to the amount of $20,500; and treasury notes of the United States, commonly called seven-thirties, to the amount of $25,500; and that said registered bonds were by the son, James M. Frazier, by virtue of a pretended power of attorney from his father, ordered to be made payable to bearer, and were thus delivered to his sister and her husband, on the 6th of July, 1866, only twelve days before the death of his father, who was then lying bed-ridden, helpless and utterly incompetent to comprehend any matters of important business—and that the other, Northern Central Railway coupon bonds, sometime during the last illness of said testator, when he was too infirm to exercise care over his property, were wrongfully taken possession of by the said Charles and Char-

lotte and converted to their own use; and that the said seven-thirty notes of the United States were, about the same time, wrongfully taken possession of by the said James M. Frazier, and converted to his own use.

The bill further charged that the said James M. Frazier, in May, 1865, prevailed on his father, then incapable of making a valid deed or contract, to execute to him without considera-tion, conveyances of certain parcels of fee simple and lease-hold property, situated in the city of Baltimore, severally improved by buildings; and that on or about the 26th of August, 1861, the said testator executed to his daughter, Charlotte, a deed of the dwelling house where he resided at the date of the deed, and continued to reside until his death, and likewise a bill of sale of the furniture in said house, and that said conveyances were made to the said Charlotte by way of portion, to be taken into account *pro tanto*, in ascer-taining and settling her share of his estate when the same should be distributed at his death.

The bill also charged that at the death of the testator, he was represented in blood by his two surviving children, James and Charlotte, the issue of his deceased son, Edward, and the several issue of his four deceased daughters by their respective surviving husbands, who were named as devisees in his will.

The bill further charged that the property so taken pos-session of by the said James and Charlotte, in the last years of his life and during the period of his mental incapacity, was largely in excess of the portions or shares of his estate to which they were entitled under his will.

The bill prayed discovery and an account, and the surren-der of all the Railway bonds and United States Treasury notes as rightly forming part of the assets of the estate of the testator, that the house and furniture conveyed to the appel-lant, Charlotte, should be adjudged to belong to the estate of her father, and in the distribution thereof be treated *pro tanto* as a part of the share or portion devised to her, that the con-

veyances made to James M. Frazier should be annulled, and the property thereby conveyed and the proceeds thereof be treated as a part of the estate of James Frazier; the bill also prayed for writs of injunction, and the appointment of a receiver. Injunctions were granted as prayed, including an injunction against the Northern Central Railway Company to restrain it from recognizing the pretended transfer of the registered bonds.

The appellants answered under oath, denying that the testator had fallen into a state of hopeless mental imbecility for more than a year before his death, or that he was bed-ridden some time previous to that event; the answer stated that he was a man of a very strong will to which he required every member of his family to bend, and this quality adhered to him to the end of his life; that he was therefore not to be influenced by those around him to do anything which he did not desire to do, or did not approve of; but he formed his own purposes, especially in regard to all matters of business or property, and carried them out with resolute determination.

That his frame was powerful and vigorous, and his health remained good almost to the last; and so far from being bed-ridden, he came down stairs to dinner the day before his death; that he had a clear and vigorous mind, and a remarkable capacity for business, which was shown by his successful career, and up to the 8th of July, he was of sound mind and competent to execute contracts and to manage his affairs, although by reason of bodily infirmity, he required an agent to attend to his collections and other matters of business; that the appellant, Charlotte, was the youngest child of her father, and for many years the only surviving daughter and the only child who always lived with him; and that he was always deeply attached to her, that she first lived in his family and he afterwards lived in her's. That in 1852, she was married to the appellant, Charles R. Johnson, who since the marriage had seldom been at home, and then for short intervals, being constantly employed as captain in the merchants' service,

until about July, 1865, since when he had found employment on shore. The answer denied that the gift of the house and furniture was intended as an advancement to the appellant, Charlotte, and alleged that the house was originally built for her by her father, as he often declared at the time it was built, but that he did not intend to give it to her as long as her mother lived. That her mother died on the 8th of August, 1861, and some weeks afterwards her father presented her with deeds of the house and furniture, without any suggestion or request on her part; that from that time she and her husband had used the house and furniture as her own, and that her right and title thereto was fully known, not only to the complainant, but to every member and relative of the family.

The answer stated the circumstances of the gift of Railway bonds, as follows: That their amount was $30,500, coupon bonds, of which $10,000 were registered in the name of the testator, 11th of March, 1857; that when he gave his daughter these bonds, he came to her chamber and handed them to her, telling her that they were coupon bonds of the company and that they were for herself; that she thanked her father for his generous gift; took them and put them into her trunk in her own room, and had had possession of them ever since; that said coupon bonds were subsequently, by the direction of her father and in his presence, placed in an envelope, on which there was the following endorsement:

" A present to Charlotte M. Johnson from James Frazier, Coupons, July 10th, 1864."

That the words " from James Frazier " were in the hand writing of her father, and the rest in her hand writing; that the gift of said bonds by her father to her, was entirely free and voluntary, without any request or suggestion of any kind from her or her husband; that her husband, as a shipmaster, was absent from Baltimore from October, 1860, to July, 1865, with the exception of about six days in the latter part of 1863, so that he was away from home upon long voyages in August,

1861, and in July, 1864, at the times when the house, furniture and coupon bonds were given to his wife.

The answer denied indignantly the charges of fraud contained in the bill, and the charge of confederating and conspiring with James M. Frazier. It also denied that it was the intention of James Frazier, at any time, to establish an equality among his children and descendants. That while he gave legacies to all his grand-daughters, he entirely left out his grand-sons from his will, and left a child's portion, in the residue of his estate, to four sons-in-law — three of whom were rich men — and the widow of a deceased son was entirely left out of the will, although she was poor and had a son fourteen years of age, for whom no provision was made.

The defendant, James M. Frazier, likewise answering under oath, stated that the allegations of the bill of complaint, that James Frazier, towards the close of his life, was incapable of intelligent transaction of business, and that more than a year before his death, he sank into a state of hopeless mental imbecility, and lost all power of making or taking care of his property, or of resisting influences which those by whom he was immediately surrounded, might choose to exercise, were utterly and flagrantly false and unfounded; and, on the contrary, averred that, up to the day previous to his father's death, he was in the full and conscious use of all his reasoning powers, of sound and disposing mind, memory and understanding, and that although his hearing had become somewhat imperfect, and his sight affected by advanced age and consequent physical debility, yet he was perfectly capable of comprehending the various transactions to which the control of so large an estate, and the management of its revenue gave rise, and such was the retentive powers of his memory, that he repeatedly, up to the time of his decease, notified the defendant, as his agent and attorney, on what particular days the respective dividends became due upon the stocks which he held, and never failed in designating the proper time to apply for them.

That in conformity with an intention often expressed to him by his father, on the 6th of November, 1865, he executed and delivered to the respondent a letter or power of attorney whereby he was authorized and empowered to transact all business requiring the presence and name "of his father," "to enter into and take possession of property belonging to him, to receive and receipt for all moneys due him, and to sign or endorse his name to all checks or orders for the payment of money to or on which his name was necessary to make good and valid;" that the power of attorney was signed by his father, and acknowledged by him before Thos. W. Griffin, Esq., a justice of the peace, who, together with the respondent's sister, Charlotte, signed the same as witnesses; that the power of attorney was made by his father, without the slightest solicitation on the part of the respondent; that at the time of signing and sealing the same, his father was in full possession of his mental powers; that he was perfectly conscious of the nature of the transaction, and aware of the character and effect of the instrument; that he was fully capable of making a valid deed or contract, and that all and every of the complainant's allegations in his bill to the contrary, were utterly and scandalously false. The answer further stated, that after the execution of the power of attorney, in pursuance of the authority thereby vested in him, he received and accounted to his father for all dividends accruing from stocks, all rents and income from his real and leasehold estate and other property; that he attended, under the instructions of his father, to the sole exchange and transfers of his stocks, and constantly acted in strict conformity with the power and trust with which he was invested; that during the whole period of the agency thus voluntarily conferred upon him by his father, he had acted with the most scrupulous good faith; that he had never appropriated to his own use any money or property belonging to his father's estate, except what was freely and without solicitation given to him by his father.

The answer also admitted the gift of the Railway bonds by the testator to his daughter Charlotte, averring that in December, 1865, the respondent heard his father say, in response to a question put to him by Charles R. Johnson, that he had given the bonds or coupons to Charlotte. The answer further stated that on or about the 22d of February, 1866, while sitting with his father, he remarked to the respondent that "inasmuch as he had given to his daughter, Charlotte, his Northern Central Railway bonds, he would now give to the respondent all of his seven-thirty United States bonds, then deposited in bank, (meaning the Second National Bank of Baltimore.") He said to the respondent, "take them and make good use of them." The respondent warmly expressed his gratitude to his father for so generous and liberal a donation, but at the same time intimated his apprehension that his father's designs and his own motives might be misconstrued, and that difficulties might arise out of the transaction. To this remark of the respondent, his father promptly responded: "Who can make trouble? I can do as I please with my own property, as I have earned it all myself."

After a brief interval, on the same occasion, he again said to the respondent, "keep those seven-thirties in your own name, and then you will be sure to have them; your sister, Charlotte, has her bonds in her own possession;" that about the 15th day of August last past, the respondent, having determined to return to the State of Kentucky, withdrew said bonds from bank, and had ever since retained them in his own possession; that at the time of said withdrawal, there were four seven-thirty bonds of the denomination of five thousand dollars each, four of said bonds of the denomination each of one thousand dollars, and three of said bonds each of the denomination of five hundred dollars; that the said bonds were voluntarily and freely given to the respondent by his father, without any solicitation, importunity or unfair dealing on the part of the respondent; that at the time when said gift was made, and when the said property was taken into posses-

sion by the respondent, his father was sound in mind, fully sensible of the nature of the transaction, and cognizant of any step taken by the respondent to render his title to said property perfect.

The answer further stated that in the month of May, 1865, the testator, in accordance with a previously expressed purpose, by deeds of gift duly executed, acknowledged and recorded, conveyed to the respondent, by the name of James Frazier, Jr., four several parcels of ground, with the improvements thereon, situated in the city of Baltimore, the locations of which said lots were properly designated in the complainant's bill; that said deeds were voluntarily made by the respondent's father, without any request or solicitation on the part of the respondent; that his father was at the time of their execution, fully capable of making a valid deed or contract; that the deeds were each and all made and executed in good faith; and upon a valid and legal consideration, and conferred upon the respondent a perfect title in law and equity to the property sought to be conveyed, and that all the allegations to the contrary in the complainant's bill, were utterly false and unfounded.

That at the time of the alleged conveyance of the house and lot on East Baltimore street, by his father to his sister, Charlotte M. Johnson, the respondent was residing in the State of Kentucky, and had no personal knowledge of the circumstances attending the same, but he had heard his father say, that he had given the house and furniture therein contained, to his said sister.

The answer denied all and all manner of unlawful combination and confederacy wherewith he was charged by the bill of complaint,       specially all connivance, collusion and confederacy with Charles R. Johnson and Charlotte M. Johnson, as alleged in the bill.

A commission was issued and a great number of witnesses were examined. The complainant was likewise examined, under the Act of 1864, ch. 109, and the defendant, Mrs. Johnson, became a witness on her own offer.

After hearing, the Court, on the 6th of February, 1869, passed a decree dismissing the bill, in so far as it sought to set aside the conveyances from James Frazier, the testator, to Charlotte M. Johnson and James M. Frazier, respectively, annulling the gifts of the Railway bonds and the United States seven-thirties, and adjudging that they belonged to, and were part of, the estate of the testator. From this decree Charles R. Johnson and Charlotte M. Johnson appealed. No appeal was taken by James M. Frazier.

The cause was argued before BRENT, MAULSBY, GRASON, MILLER and ALVEY, J.

*George Wm. Brown* and *Frederick Wm. Brune,* for the appellants.

[The argument upon the facts of the case, and the principles of law applicable thereto, as governing the transfer of property, where the donor and donee occupy confidential relations to each other, is omitted, inasmuch as the questions arising thereunder were not passed upon by the Court, the decision being confined to the determination of the incompetency of the defendant, Mrs. Johnson, under the Act of 1868, ch. 116, to testify on her own offer.—REPORTER.]

The Act of 1868, ch. 116, had three distinct objects :

1st. When an original party to a contract or cause of action is dead or insane, or when an executor or administrator is party to a suit, it provides that *"either* party may be called as a witness by his opponent, but shall not be admitted to testify on his own offer, or upon the call of his co-plaintiff or co-defendant, otherwise than now by law allowed, *unless a nominal party merely."*

The ambiguity as to the meaning of the words *"*other party*"* in the Act of 1864, ch. 109, sec. 2, is thus removed, and this was the first object of the Act; *either* party may now be called as a witness, but cannot testify on his own offer unless he is a *nominal party.* This latter provision as to a nominal party is precisely the same as that in the Act of 1864.

2d. But the Act of 1868, ch. 116, contains a proviso, the object of which is to create two additional exceptions to the provision contained in the body of the Act prohibiting executors, &c., from being witnesses on their own offer, in suits on contracts, where an original party is dead or insane, or in suits to which they are parties.

The first exception in the proviso is very clearly stated, and is free from all possible ambiguity, and is in harmony with the spirit and meaning of the general provisions of the Act of 1864, ch. 109, which was designed to make all parties to a contract competent witnesses, who are living and able to testify.

The exception is, that when executors, &c., are parties to a suit on a contract *made with them*, either party is, in all respects, a competent witness.

3d. The second exception in the proviso is not limited like the first, to cases where executors, &c., are parties to a suit *on a contract made with them*, but embraces all cases included in the Act—that is, all cases " when an original party to a contract or cause of action is dead, or shown to be lunatic or insane, or when an executor or administrator is a party to the suit, action or other proceeding;" and in such cases the proviso enacts that " when the executor, administrator, guardian or committee *testifies as to any conversation had with the other party*, either party may be examined as a witness, as provided for in the other sections of this article."

The exception, then, is, that an executor, &c., when he is a party to a suit, *may testify* as to any conversation had with the other party, and if he does so, then *either party* may be examined as a witness on his own offer, and as to the whole case. The language of the Act is not, indeed, *may testify*, but that is its meaning. The language is, " when the executor, &c., *testifies* "—that is, it *assumes* and *declares* that he has the right to testify, and therefore, by implication, as clearly authorizes and permits him to do so as if it had so declared in express terms. But whether the executor has this right or

not, yet, if he does so testify, and his testimony is not excepted to, and is, in consequence, received and relied on, then the Act expressly makes the other party a witness as to the whole case.

The complainant testified as to conversations which he had with all the defendants, and this gave them the right "to be examined as witnesses, as provided for in the other sections of this article." What that examination is designed to be, is shown by the first section of the Act of 1864, ch. 109, which provides that "such witness shall be competent and compellable to give evidence *in the same manner as other witnesses*, except as hereafter excepted."

This exception, so far as the defendants are concerned, is repealed by the proviso in the Act of 1868, ch. 116, sec. 2, and the defendants were therefore made *general witnesses*, "*competent and compellable to give evidence in the same manner as other witnesses*," and they are not confined to the particular conversations about which the complainant testified.

The object of the complainant in testifying to his conversations with the defendants was to show, by their statements, that the gift, which they allege was made by Captain James Frazier to his daughter, was, in fact, not made, and that he was not competent to make it; and it would be exceedingly unjust, and would tend, not only to suppress, but to distort the truth, if the complainant were permitted to testify on these material points, and the defendants were excluded from disclosing their knowledge of the real facts of the case.

Unless this construction of the proviso in the Act of 1868, ch. 116, be correct, it is absolutely without sense or meaning. There is no ambiguity in the proviso itself, for the language is perfectly clear and plain. Nor is there a conflict between it and the body of the Act, which the Court should seek to reconcile.

And even if there were a conflict between the proviso and the body of the Act, the proviso must prevail, because the proviso "speaks the last intention of the law-giver." *Smith's*

*Com. on Stat. and Const'l Const.*, sec. 578; see also *Leonard vs. Wiseman*, 31 *Md.*, 204; *Canal Co. vs. Railroad Co.*, 4 *G. & J.*, 1; *Maxwell vs. Sency*, 5 *H. & J.*, 26; *Beall vs. Black*, 1 *Gill*, 203; *Gordon vs. Mayor, &c., of Baltimore*, 5 *Gill*, 231.

*Arthur W. Machen* and *I. Nevett Steele*, for the appellee.

By a fair construction of the provision added by the Act of 1868, ch. 116, to the original Act of 1864, ch. 109, it can have no application to a case like the present, where the testimony of the executor, which is to be ground for the admission of the testimony of the other party, was given *before the passage of the new law*. The employment of the word "testifies" in the clause in question, instead of "has testified," or some similar expression, evidently points to *future* testimony —to testimony to be introduced after the law begins to speak and be operative.

Such is the natural construction of the statute. But, even if its language were more doubtful, and were susceptible of a different interpretation, a well established principle of law would forbid that it should be allowed to operate retroactively. This principle is no where more clearly or forcibly stated than by the Court of Appeals in the recent case of *Williams vs. Johnson*, 30 *Md.*, 507, 508; see also *Dash vs. Van Kleeck*, 7 *Johnson*, 502; *McEwen et. al. vs. Den, Lessee*, 24 *Howard*, 244; *Haver vs. Yaker*, 9 *Wallace*, 32.

When an executor, under the Act of 1868, proceeds to testify to conversations with the other party, he voluntarily makes his election to open the door to the testimony of the latter. He becomes a consenting party to the admission of testimony from the opposite party. But it is manifestly unjust and contrary to reason to construe anything that he may have done before the passage of the Act *diverso intuitu*, as having the effect of such an assent or election. *Hughes vs. Lumley*, 4 *El. & Bl.*, 358, (82 *Eng. C. L.*;) *Vansittart vs. Taylor*, 4 *El. & Bl.*, 910–912–915; and *Midland Railway Co. vs. Pye*, 10 *C. B. N. S.*, 191, (100 *Eng. C. L.*)

The deposition of the complainant, containing the evidence as to conversations which is relied on by the defendants as justifying the examination of Mrs. Johnson, was taken on the 10th day of May, 1867. The Act of 1868, ch. 116, was passed on the 6th of March, 1868, and went into effect on the first of June, 1868. When Mr. Heald was examined, he was, under the then existing law, a perfectly competent witness for all purposes. Mrs. Johnson at the same time, was incompetent to testify to anything. How could a law, passed ten months afterwards, and which did not go into operation till more than a year afterwards, render her competent by reason of anything in Mr. Heald's testimony, taken under an altogether different state of the law? Testimony of an executor examined after June 1st, 1868, or perhaps after the 6th of March, 1868, the date of the enactment of the new law, would be produced subject to the conditions of the Act of 1868; testimony given in 1867, came into the cause like the testimony of ordinary witnesses—unqualified by any condition.

All the witnesses in the cause, indeed, other than Mrs. Johnson, were examined before the Act of 1868 went into effect, and, consequently, under the original law of 1864. The whole testimony on the part of the *complainant* was closed on the 25th of May, 1867.

The word *either*, in the fourth line of the Act of 1868, seems to be a clerical error for the original words "the other." The whole object of the amendatory Act is evidently contained in the additional clause, following and including the word *provided*. The previous part is simply a re-enactment of the original section, in conformity with the constitutional provision as to the mode of introducing amendments into the Code. This inference is confirmed by a reference to the Massachusetts Statute, which was the prototype of our own legislation. *Gen. Stat. Mass.*, 1860, *ch.* 131, *sec.* 14.

The section as it stands, exhibits one of those accidental changes of phraseology which a Court is entitled to disregard; as was done in *Kennedy vs. Gibson*, 8 *Wall.*, 498–506.

What was the object of this clause, and what the injustice it sought to correct, is sufficiently manifest. Provision had already been made for the admission of the testimony of both parties where the cause of action arose, or contract was made with the executor or administrator. But there was still to be provided for the case where, although the contract was with the deceased, conversations in reference to it had taken place between the executor and the other party, and to permit the executor to testify as to these, while the other party was excluded, was regarded as not only unjust, but as inconsistent with the general principle adopted by the law, that the evidence of neither party to a transaction should be excluded, except where one of them was dead or insane. This inequality, which existed before the Act of 1868, it seems to have been the intention of the clause under discussion to remove. Looking then to the reason of the law, Mrs. Johnson was not a competent witness, under any circumstances, except for the special purpose of testifying as to conversations with the executor.

In the present case, independently of the fact that an executor is a party to the suit, Mrs. Johnson is incompetent to substantiate an alleged gift from Captain Frazier, by her own testimony, under the *first* clause of the Act of 1868, chapter 116, and upon the ground there stated, namely : That one of the original parties to the contract or cause of action is dead. *Ayres vs. Ayres,* 11 *Gray,* 132; *Pettingill vs. Porter, et al.,* 3 *Allen,* 352.

The Johnsons claim that there was an absolute gift of the bonds to them by Captain Frazier in his lifetime. This they would have to substantiate against Captain Frazier, if he were living. This they have to substantiate, now that he is dead. But, inasmuch as he is dead, the statute forbids that they should do it by their own testimony.

If the Johnsons set up no title *derived from Capt. Frazier,* their inability to testify would then depend merely on the fact that the complainant is an executor; but since the right

they assert as against Captain Frazier and his representatives, rests upon a supposed title derived, as they say, from Captain Frazier through a transaction to which Charlotte M. Johnson and he were the parties, they are prevented from testifying by the general prohibition expressed in the first clause of the section.

MILLER, J., delivered the opinion of the Court.

When the Legislature, by the Act of 1864, chapter 109, removed the incompetency of witnesses arising from interest and crime, and declared that the parties litigant and all persons in whose behalf any suit, action or other proceeding, may be brought or defended, themselves and their wives and husbands, shall be competent and compellable to give evidence in the same manner as other witnesses, they made certain exceptions which in our judgment clearly manifest the purpose of the law makers and the spirit and intent of the law. It appears to us to have been the design of this legislation, in admitting parties to suits to testify at their own instance, to provide that they should do so on terms of perfect equality as to knowledge or means of knowledge of the subject-matter of controversy about which they were to speak. It would have been flagrantly unjust to permit a party whose property was at stake, subjected to all that influence of interest which the infirmity of human nature and the experience of ages had demonstrated to be so powerful as in most cases to shake integrity, and induce a departure from truth, and on which the rule of exclusion in all cases was founded, to go upon the witness stand and tell his story of the transaction and give his version of the contract against one whose lips were sealed by death or insanity. This obvious rule of justice, mutuality and fairness was not overlooked by the Legislature, and hence by the 2d section of that Act it was provided that:

" When an original party to a contract or cause of action is dead or shown to be lunatic or insane, or when an executor or administrator is a party to the suit, action or other pro-

ceeding, the *other party* may be called as a witness by his opponent but shall not be permitted to testify *on his own offer* or upon the call of his co-plaintiff or co-defendant, otherwise than now by law allowed unless a nominal party merely."

The spirit of this provision and the intent of its framers are sufficiently apparent, but it was in some respects defective and unfortunately worded.   It had received no construction by the Appellate Court prior to the passage of the amendatory Act of 1868, chapter 116, but in some, perhaps in all the circuits, the practice had obtained, sanctioned apparently by the language of this section, of allowing an executor or administrator in *all cases* where he was a party to the suit, no matter when the cause of action arose or what was the subject of controversy, to become a witness on his *own offer* because the prohibition to that extent was against the *other party* only, and not to allow the latter to testify except upon the call of his adversary.   In other words and to illustrate the effect of this construction, if an executor was sued on a cause of action against his testator, he could, on his own offer, testify to any conversations he may have held with the plaintiff or to any admissions made by the latter, as, for instance, he might testify that the plaintiff told him the debt was paid, and yet the latter could not himself be a witness at his own instance either to contradict or explain such conversations or statements; so when suing for a debt due his testator, the executor could testify as to an admission by the defendant that would remove the bar of the Statute of Limitations, whilst the latter could not contradict or explain such statement.  Again an executor might be plaintiff or defendant in a suit where the cause of action arose since the death of the testator on some contract or transaction connected with the estate between him and the other party, and one would be allowed to testify on his own offer and the other not.   In our opinion it was the main purpose of the law of 1868, chapter 116, to meet such cases as these, and preserve the rule of mutuality and fairness to which we have adverted.   It re-

peals the 2d section of the Act of 1864, and enacts in lieu thereof that:

"When an original party to a contract or cause of action is dead or shown to be lunatic or insane, or when an executor or administrator is a party to the suit, action or other proceeding, *either party* may be called as a witness by his opponent, but shall not be permitted to testify on his own offer or upon the call of his co-plaintiff or co-defendant, otherwise than now by law allowed unless a nominal party merely; *provided,* that when an executor or administrator, guardian or committee of a lunatic or insane person is a party to the suit, action or other proceeding, when the cause of action has arisen on a contract made with such executor, administrator, guardian or committee, or out of transactions between such executor, administrator, guardian or committee, and the other party, *or* when the executor, administrator, guardian or committee *testifies* to any *conversations* had with the other party, *either party* may be examined as a witness, as provided for in the other sections of this article."

By that part of this law which precedes the proviso, an important change is made, or, at least, a grave doubt upon its construction as it stood in the second section of the Act of 1864, is removed; for it is plainly said that, in all cases where the cause of action antedates the death or lunacy, or where an executor or administrator is a party to the suit, *neither party* shall be admitted to testify on his *own offer*, but only on the call of his adversary. This is made a general and just rule, and thus the injustice of allowing the executor or administrator to testify in every case on his own offer, whilst the other party was excluded from so doing, resulting from the practice under the previous Act, was obviated. Then comes the *proviso,* which · clearly creates exceptions to this general rule, and in certain specified cases, allows either party to be a witness on his own offer in the same manner as in cases where the cause of action is between living parties. The first exception is where the cause of action follows the

Johnson and Wife *vs.* Heald, Ex'r of Frazier.

death or lunacy and arises on some contract or out of some transaction between the executor, administrator, guardian or committee and the other party. In such cases, it is very clear either party can testify on his own offer, and here the rule of mutuality and fairness is strictly preserved, because both parties have equal knowledge or means of knowledge of the subject about which they are to give testimony. Provision is next made for cases where *conversations* may have taken place between the executor, administrator, guardian or committee, and the other party in reference to the cause of action or controversy when it antedates the death or insanity. With respect to these *conversations*, though not so clearly expressed as in the other cases, yet by fair implication from the words used, either party is made competent to testify on his *own offer*. But to what extent? On one side there can be no doubt of the limit. It is these conversations alone that the executor can on his own offer speak of. In all justice and fairness the other side should be confined to the same subject matter also. To these alone as a subject matter of testimony this part of the proviso refers, and with these alone it professes to deal, and we are of opinion the true construction of this statute, looking to the spirit and general intent of the whole law, and the objects it seeks to attain, require that both parties in such cases should be confined to the giving in evidence and the denial or explanation of the conversations that may have occurred between them. In other words the executor, administrator, guardian or committee, may on his own offer or on the call of his co-plaintiff or co-defendant go upon the stand and give in evidence adversely to his opponent any conversations he may have had with the latter, and if he does so, then the other party, likewise on his own offer or the call of his co-plaintiff or co-defendant, may testify in respect to such conversations or admissions by giving such evidence as will fairly tend to contradict, explain or modify them, but beyond this he cannot go. This is our reading and construction of this part of the proviso. To give

it a broader scope and to allow the other party, where the executor testifies and can only testify to conversations, to become a witness at large for every purpose of the action, to give his story and version of the whole transaction between himself and the deceased, who cannot speak, would, in our judgment violate the rule of mutuality, work in many cases great wrong and injustice, and be inconsistent with the general tenor and intent of the whole legislation on this subject. It would give to the other party in such cases a greater advantage than the executor or administrator had under the previous law, and perpetuate one of the very mischiefs that law allowed, and which the Act of 1868, was intended to cure. We cannot attribute to the Legislature such a purpose. The construction we have adopted is just and reasonable, and is but a legitimate application of the canon of interpretation sanctioned by the Court of Appeals in 4 *G. & J.*, 152, where it is said: "Statutes should be construed with a view to the original intent and meaning of the makers, and such construction should be put upon them as best to answer that intention which may be collected from the cause or necessity of making the Act, or from foreign circumstances, and when discovered ought to be followed although such construction may, seem to be contrary to the letter of the statute."

Under the construction we have thus placed upon this law, we are satisfied Mrs. Johnson was incompetent to speak of any of the matters about which she has testified. The executor had been examined under the Act of 1864, and in the course of his examination had given testimony as to conversations and interviews between himself and Mrs. Johnson, but to the latter no interrogatory was put relative to these conversations and no contradiction or explanation of them offered. She became a witness on her own offer and testified at large to the whole cause, to her father's mental condition and capacity to make the gift, to the previous gift of the house and the furniture, to the writing on the envelope in which the bonds were placed, and then gave a detailed state-

ment of all that occurred in reference to the secret gift of this large amount of bonds between herself and her deceased father, when no other human being was present. She was not cross-examined and her whole testimony is excepted to on the ground of her incompetency as a witness. In our opinion she was not competent to testify on any of these matters and the exception to her testimony should be sustained. This direct and positive proof of the gift out of the case, we cannot, after the most careful and patient examination of all the other testimony in the record, discover sufficient, reliable and satisfactory evidence to establish the fact of the gift, without which the case of the appellants has no foundation.

In these views a majority of the Judges, constituting the Court that heard the cause, concur, and the result is that the decree appealed from must be affirmed. In disposing of the costs, we are of opinion that under all the circumstances of the case, all of them as well those in the Court below as in this Court, ought to be paid by the executor out of the estate, and will so provide in the decree of affirmance.

*Decree affirmed.*

(Decided 8th December, 1870.)

BRENT and GRASON, J., dissented.