(Decided 18th June, 1879.)

---

THOMAS A. HARDY, JR., EDWARD M. HARDY and WILLIAM C. HARDY, trading as HARDY & BROS. *vs.* THE CHESAPEAKE BANK.

*Relation of Banker and Depositor—Liability of a Bank in the Payment of Checks of Customers—Forged Checks—Presumption that a Bank Account is Correct, when the Bank Book has been Balanced and Checks returned to Customer—When a Confidential Clerk not the Agent of his Employers—Estoppel—Admissibility in Evidence of a Check Book containing Stubs of Checks—Production of Books in Evidence—Confession of a supposed Forger—Construction of the Acts of 1864, ch. 109, and of 1876, ch. 222, as to the Competency of a Surviving Partner as Witness in a Suit by the Firm—Questions asked a Bank Clerk as to his Judgment of what a Forger would do under given circumstances, inadmissible.*

The relation between banker and customer who pays money into the the bank, or to whose credit money is received there on deposit, is

Hardy & Bros. *vs.* Chesapeake Bank.

the ordinary relation of debtor and creditor, and when the bank receives the money as an ordinary deposit, and gives credit to the depositor, the money becomes the funds of the bank, and may be used by it as any other funds to which it may be entitled. It is accountable for the deposits that it may receive as debtor, and in respect to ordinary deposits, there is an implied agreement between the bank and the depositor, that the checks of the latter will be honored to the extent of the funds standing to his credit. There is no question of trust, therefore, between the parties, but their relation is purely a legal one; and if the bank pays money on a forged check, no matter under what circumstances of caution, or however honest the belief in its genuineness, if the depositor himself be free of blame, and has done nothing to mislead the bank, all the loss must be borne by the bank, for it acts at its peril, and pays out its own funds and not those of the depositor. It is in view of this relation of the parties, and of their rights and obligations, that the principle is universally maintained, that banks and bankers are bound to know the signatures of their customers, and that they pay checks purporting to be drawn by them at their peril. No right or title can be legally claimed through a forgery ; and the possession by the bank of a forged check upon which money has been paid, affords of itself no ground for claim of credit in account as against the party whose name has been forged. If a customer of a bank having a deposit account, and who is in the habit of drawing checks upon that account, should, by words or acts, cause the bank, the latter acting upon such reasonable grounds as prudent business men generally act, to make payment on a forged check, such customer would not be allowed, as against the bank, to set up the forgery that he, by his conduct, had induced the bank to act on as a genuine check.

When the appellants' bank account with the appellee had been balanced and the book and the cancelled checks returned to them, after the lapse of a reasonable time, (within which the checks and account could have been examined and compared,) without objection being made, the presumption arose that the account as balanced, and also the checks charged therein, were all correct. This presumption however, proceeds upon the ground simply of an implied admission, and is only *prima facie* in its effect. It is liable to be repelled by showing that the error or fraud complained of, (it being alleged in this case that the checks were forged by the confidential clerk of the appellants,) was not discoverable by the exercise of reasonable care and diligence, or that there was no such appearance

of things as to excite the suspicion of a reasonable man, or that, for any reason, the party had not had an opportunity to examine the account.

A confidential clerk, entrusted to make the entry of all checks in his employers' bank-book, who has forged checks in their name and made the fraudulent entry of those checks in their bank book, is not the agent of his employers for any such purpose, as they are bound by the acts of their agent only so far as the agent acts within the limits and scope of his employment. The fraudulent knowledge of the agent in regard to acts and transactions outside of and beyond his employment cannot be imputed to his principal.

Where forgeries were alleged as above stated, and the appellee was sued to recover an alleged balance due the appellants as depositors, the jury should have been required to find, either that the appellants had knowledge in fact that the forgeries had been committed, or that from carelessness and indifference to the rights of others, they failed to inform themselves from sources of information readily accessible to them, and which, by the exercise of ordinary diligence of business men, would have disclosed to them the fact that the forgeries had been committed. If such facts be found to exist, then it must be also found, in order to work an estoppel, that the appellee acted in honoring and paying forged checks presented after other forged checks had been returned with the balanced bank-book to the appellants, in reference to the conduct of the appellants in failing to make known an objection to the account, as stated and balanced in the bank-book so returned, and that such omission and neglect of the appellants did in fact mislead the appellee into the error of paying the forged checks presented after the other forged checks had been returned with the balanced bank-book to the appellants.

The doctrine of estoppel *in pais* is applied in a great variety of circumstances, but its great object is to prevent injustice being done, where one party has been led into error by the fault or fraud of the other. It can have no application except where the party invoking it can show that he has been induced to act, or refrain from acting by the acts or conduct of the adverse party, under circumstances that would naturally and rationally influence ordinary men. It can, therefore, only be set up and relied on by a party who has been actually misled to his injury; for if not so misled he can have no ground for the protection that the principle affords.

There was a duty owing from the appellants to the appellee to act with that ordinary diligence and care that prudent business men

generally bestow in the examination and comparison of the debits and credits contained in their balanced bank-book returned to them, in order to detect any errors or mistakes therein.

Where the appellants' check-book, containing the stubs of checks, was offered by the appellants in evidence, in an action against the appellee to recover the amount of an alleged balance due appellants as depositors, it being alleged that certain checks paid by the appellee were forged, for the purpose of showing, not the truth of any entry therein, or the fact that any particular entry had been therein made, but that there was not in fact anything disclosed therein, upon ordinary inspection, calculated to excite suspicion that a fraud had been committed by the party in whose custody it had remained; on objection, it was HELD:

That the book was admissible for the purpose stated.

But where the appellants offered to prove, by the production and proof of the check-book, that a memorandum, testified to having been made by one of the appellants to show how his account stood at the time forged checks had been issued and the book was balanced, and sent to the appellee, was incorrect; on objection, it was HELD:

That there was nothing to show that the memorandum referred to was made exclusively from the showing of the check-book, or that it was not made with respect to other sources of information within the control and knowledge of the appellant who made it; and that being the case, the check-book was inadmissible, as it could furnish no legitimate evidence to rebut any inference that might be drawn from the memorandum.

Where a witness was asked by the appellants if in making the search for the checks, he had examined the appellants' books to ascertain whether the amount of the alleged forged checks had passed into the funds of the firm, which the appellants composed, and been applied to their use, and if so, what was the result of such examination, offering at the same time to produce the books. HELD:

That the objection by the appellee to this question was properly sustained.

The confession of H., the supposed forger of the checks, was inadmissible against the appellee; such evidence is not admissible as against third parties.

One of the original co-plaintiffs, (who was a non-resident and non-active partner,) in the suit against the bank, having died after the suit was instituted, his death was suggested before the trial below,

Hardy & Bros. vs. Chesapeake Bank.

and one of the surviving co-plaintiffs was offered as a witness; on objection, it was HELD:

That there is nothing in our Statutes in relation to the competency of parties as witnesses, that should exclude the party under the circumstances of this case; that he was not embraced by the exception contained in the Act of 1864, ch. 109, sec. 2, as amended by the Act of 1876, ch. 222.

Where a contract is made with a partnership composed of a great number of persons, some of whom are active in the business, and others not, or some of them reside abroad, and have no personal knowledge of the transactions of the firm, in such case, it would neither comport with the design of the Legislature, nor the reason of the thing, to exclude the parties to the actual transaction, simply because one of the non-active or non-resident technical co-contractors should happen to die after the contract was made.

Questions asked a witness, who was a clerk in the bank, which did not seek the knowledge of the witness as to the genuineness of the handwriting of the party supposed to have drawn the checks, but sought to elicit the judgment of the witness as to the degree of prudence or caution that would likely have influenced the conduct of the party drawing the checks, if they had been forged, were inadmissible. Whether a forger was less likely to present checks with particular marks upon them than otherwise, was a question the witness was incompetent to answer. The jury were as competent to form their conclusions from the marks and indications on the face of the checks, as the witness; and where such is the case the witness is not allowed to give his judgment.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

*Exceptions.*—At the trial the plaintiffs took nine exceptions:

The *first* and *seventh exceptions* were to the rulings of the Court, in excluding the check-book of the plaintiffs. The first exception is sufficiently stated in the opinion of the Court. The plaintiffs offered, as stated in the seventh exception, to prove by the production and proof of their check-book, that a memorandum testified by a witness on behalf of the defendant, to have been made by the plain-

tiff Edward M. Hardy, in pencil, to show how his account stood, on the 10th October, 1873, and which memorandum witnesses on behalf of the defendant had testified to be substantially the same in the balance shown by it, as the account on the books of the bank, was incorrect, and did not show the state of the account as truly appearing by the check entries in said check-book, but the state of the account as falsely and fraudulently kept by Holmes, by passing the additions at the foot of each page of the stubs on said check-book, by means of which fraud said Hardy was misled in making said memorandum. Which offer and testimony offered were rejected by the Court, and the plaintiffs excepted.

The *second exception* was to the refusal of the Court to permit Mr. Beck, book-keeper of the plaintiffs, to answer the following question: Whether or not, in making a search for the missing checks, he had examined the books of the firm, (which plaintiffs offered to produce by witness,) to trace out if the amount of those checks, or any of them, had passed into the funds of Hardy & Bros., and had been applied to their use, and if yea, what had been the result of such examination?

The *third exception* was to the refusal of the Court to admit in evidence the confession of Holmes referred to in a letter of the plaintiffs to the defendant, dated the 18th October, 1873, and which confession was written by Holmes and signed and sworn to by him before a justice of the peace, prior to the 15th October, 1873, wherein he confessed and acknowledged the forging by him of the several checks, of the forgery of which the plaintiffs had offered proof, which confession the plaintiffs offered in evidence in connection with the plaintiffs' letter to the defendant and the defendant's answer thereto.

The *fourth* and *eighth exceptions* were to the refusal of the Court to admit Edward M. Hardy, one of the plaintiffs, as a competent witness, notwithstanding the death of his co-plaintiff, Thomas A. Hardy, Sr., who

resided in Norfolk, Virginia, and never took any part in
the business of the firm of Hardy & Bros., of which he
was a member.    The defendant, as appears in the fourth
exception, did not object to the competency of E. M.
Hardy, to prove that the parties named in the declaration
as plaintiffs, composed the firm of Hardy & Brothers, and
also did not object to that part of the offer, to prove that
he made diligent search for the checks alleged in the
proffer to have been missing, and that he could not find
them, in so far as the evidence as to said search was
proffered to lay the foundation for the introduction of
secondary evidence of the contents of such missing checks ;
but the defendant objected to his competency to show,
that certain checks not produced, charged against the firm
by the defendant in the bank-book in evidence, were never
drawn or paid by the firm, and that if there were ever any
such checks in existence they were false and forged ; and
that all of said forged checks were issued without the
knowledge or privity of the plaintiffs or any of them ; and
that the fact that any of them had been paid, was not
known to or suspected by the plaintiffs, or any of them,
until on or about the 10th October, 1873.    In the eighth
exception it appears, that the plaintiffs offered Edward M.
Hardy in rebuttal, as a witness, to testify as to various con-
versations with him, proven by various witnesses for the
defendant, and to contradict the said witnesses in respect
thereto.

The *fifth* and *sixth exceptions* were to the allowance
by the Court of questions addressed by the defendant to
Wilson, a witness for it, and the answers thereto, relative
to the motives and conduct of a forger under given cir-
cumstances, and to the fact that if a check had imperfec-
tion in the signature, such imperfection was sufficient to
indicate to witness' judgment that the check was genuine.
The questions are set out in the opinion of the Court.

The *ninth exception* was to the admissibility of evidence
(taken subject to exception) introduced by the appellee,

in so far as, and to the extent that it attempted to establish admissions or acquiescence on the part of the plaintiffs, whereby it was claimed they were estopped from setting up the forgeries on the checks offered in proof. The plaintiffs then offered the following prayers:

1. The plaintiffs pray the Court to instruct the jury, that the defendant, as a bank receiving deposits, is held by law to the obligation to know the signatures of its depositors, and if the jury shall find from the evidence that the fourteen checks, or any of them, which have been produced in proof by the plaintiffs, and are claimed by them to be forgeries, and for which the defendant claims credit in account, are in fact forgeries, the plaintiffs are entitled to recover in this action.

2. The plaintiffs further pray the Court to instruct the jury, that if they shall find from all the evidence that the first five checks, viz., Numbers 4175, for $140; 4191, for $200; 4222, for $220; 4226, for $100, and 4229, for $200, making in all $860, which have been produced in proof by the plaintiffs, and are claimed by them to be forgeries, are in fact forgeries, the plaintiffs are entitled to recover in this action the amount of said checks, less thirteen dollars, with interest, in the discretion of the jury, from the 18th October, 1873.

And defendant offered eight prayers, (of which the sixth and seventh were omitted from the record,) as follows:

1. If the jury find from the evidence that the plaintiffs, in the year 1873, and for some years before, kept a bank account with the defendant, and that the bank-book offered in evidence by the plaintiffs is their bank-book with the defendant, and that the bank made the entries on the deposit side of said book, and required the plaintiffs to enter the checks drawn by them on the other side, and that said bank account was settled and balanced on said book on the 13th July, 1873, and the balance ascertained to be due the plaintiffs was carried forward in said book

and credited to the plaintiffs in the book, and the paid checks embraced in said balances were then returned to the plaintiffs; and shall further find, that Holmes was the confidential clerk of the plaintiffs, and had charge of their check-book and bank-book, and that it was part of his business and duty to enter the checks of the plaintiffs in said bank-book, and to examine and see that the balances were correct, and that all the checks embraced in said balancing were entered in said book by the said Holmes, and among them the following five checks offered in evidence by the plaintiffs, viz:

No. 4175, May 10th, 1873, for $140.00; No. 4191, May 24th, 1873, for $200.00; No. 4222, June 9th, 1873, for $220.00; No. 4226, June 14th, 1873, for $100.00; No. 4249, June 23rd, 1873, for $200.00.

And that said five checks were paid by the bank in good faith in the usual course of business, and shall also find that the plaintiffs continued their account with the defendant, with the balance ascertained by the said settlement of the 13th July entered in said book, as the first item to their credit in the continued account, and kept said account with the defendant, as shewn by said book, down to the 14th October, 1873, and that during the whole period of the continued account said balance was considered and acted upon as correct by the plaintiffs, and by the defendant, and that said bank-book was settled and balanced again on the 6th October, 1873, as shewn by said book, and that all the checks up to said date, except the four last, were entered in said book by the said Holmes, and that said book was again balanced on the 10th of the same month, as shewn by said book, and that no intimation was given by the plaintiffs to the defendant, that they alleged that any of the checks charged in said bank-book were forged until about the 20th October, 1873; and shall also find that E. M. Hardy, one of the plaintiffs, very frequently looked at the state of his firm's

account on the bank ledger, and that on or about September 26th, 1873, being informed by the cashier of the defendant that the plaintiffs' account would be over to the extent of $400, if the defendant should pay a check of the plaintiffs which had come through the clearing house, and that said Hardy admitted that the account would be over, and asked the defendant to discount for his firm a note of $1000 to cover said over-draft and to meet some checks which he said were outstanding, and defendant did discount the said note for said purposes, to save the credit of the firm, and that a money panic was then prevailing, growing out of the failure of J. Cooke & Co., and that defendant was not then discounting paper, except some few renewals, and would not have discounted said note, except for the purposes above stated; and shall also find that on the 9th of October, 1873, plaintiffs were informed by the defendant that their account was over about $180, and the said E. M. Hardy, after making some memoranda in pencil, admitted the account was over about $175, if a certain Savannah collection of $250 was not placed to its credit, and if said credit was given, said it would show a balance of $75 in their favor, and that this statement differed very slightly from the state of the account as alleged by the defendant; then the plaintiffs are not entitled to recover in this action the amount of the said five checks, even if the jury should believe from the evidence that the signatures of said checks were forged by the said Holmes.

2. If the jury find from the evidence that the plaintiffs, in the year 1873, and for some years before, kept a bank account with the defendant, and that the bank-book offered in evidence by the plaintiffs, is their bank-book with the defendant, and that the bank made the entries on the deposit side of said book, and required the plaintiffs to enter the checks drawn by them on the other side, and that said bank account was settled and balanced on said

book on the 13th July, 1873, and the balance ascertained to be due the plaintiffs was carried forward in said book and credited to the plaintiffs in the book, and the paid checks embraced in said balances were then returned to the plaintiffs; and shall further find that Holmes was the confidential clerk of the plaintiffs, and had charge of their check-book and bank-book, and that it was part of his business and duty to enter the checks of the plaintiffs in said bank-book, and to examine and see that the balances were correct, and that all the checks embraced in said balancing were entered in said book by the said Holmes, and among them the following five checks offered in evidence by the plaintiffs, viz.,

No. 4175, May 10th, 1873, for $140.00; No. 4191, May 24th, 1873, for $200.00; No. 4222, June 9th, 1873, for $220.00; No. 4226, June 14th, 1873, for $100.00; No. 4249, June 23rd, 1873, for $200.00.

And that said five checks were paid by the bank in good faith in the usual course of business; and shall also find that the plaintiffs continued their account with the defendant, with the balance ascertained by the said settlement of the 13th July, entered in said book as the first item to their credit in the continued account, and kept said account with the defendant, as shewn by said book, down to the 14th October, 1873, that said bank-book was settled and balanced again on the 6th October, 1873, as shewn by said book, and that all the checks up to said date, except the four last, were entered in said book by the said Holmes, and that said book was again balanced on the 10th of the same month, as shewn by said book, and that no intimation was ever given by the said plaintiffs to the defendant, that they alleged that any of the checks charged in said bank-book were forged, until about the 14th October, 1873; and shall also find that the nine checks offered in evidence by the plaintiffs, numbered as follows:

Hardy & Bros. *vs.* Chesapeake Bank.

No. 4329, July 29th, 1873, for $220.80; No. 4344, August 4th, 1873, for $200.00; No. 4374, August 13th, 1873, for $230.56; No. 4394, August 16th, 1873, for $100.00; No. 4403, August 25th, 1873, for $145.50; No. 4451, September 10th, 1873, for $140.00; No. 4454, September 18th, 1873, for $200.00; No. 4481, October 6th, 1873, for $60.00; were paid by the defendant in good faith, in the usual course of business, and that the signatures to the said nine checks, and the signatures to the five checks specified in the first prayer, were all written by the said Holmes, and are all in the same handwriting, having the same general characteristics, then the plaintiffs are not entitled to recover in this action the amount of said nine checks.

3. If the jury find the facts stated in the defendants' first and second prayers, then the plaintiffs are not entitled to recover in this action the amount of the five checks specified in the first prayer.

4. That the plaintiffs in keeping their bank account with defendant, were found at all times to know its condition with reasonable accuracy, and if the jury find that the said bank account was posted on the 12th July, 1873, and the said bank-book on its check side, was stated by plaintiffs, or by their clerk duly authorized by them in that behalf for such settlement, and that the five of said checks alleged to be forgeries, given in evidence, were included therein, and duly returned to plaintiffs as such settlement, that then if the jury shall find that said five checks were not the genuine checks of plaintiffs, but forgeries, it was the duty of said plaintiffs to have so informed the defendant within a reasonable time after such settlement; and if the jury shall find that said defendant was not so informed within such reasonable time, but that plaintiffs and defendant continued to deal with each other thereafter on the faith of such settlement, then the plaintiffs cannot recover the amount of said five checks, or any part thereof.

5. That if the jury believe that said bank-book settlements were made as given in evidence, and that the defendant made a loan to said plaintiffs on the 26th September, on the faith of the correctness thereof, and that the said defendant would not otherwise have made the same, had not the said account as stated been at that time conceded to have been correct, then the plaintiffs cannot recover as to the five checks included in the July settlement.

8. There can be no recovery for the amount of any one or more of said fourteen checks, unless the jury shall find the signatures to the same were not the genuine signatures of the plaintiffs; and if the jury find that the plaintiffs' bank-book had been balanced and the checks returned by the bank to the plaintiffs, and no objection made to their payment by plaintiffs, then as to such checks the burden of proof is on the plaintiffs to show the forgery.

The defendant's eighth prayer was conceded. The Court (DOBBIN, J.,) rejected the plaintiffs' first prayer as offered, but granted the same as qualified by defendant's second prayer, and granted the plaintiffs' second prayer and the defendant's second prayer, and refused the defendant's first, third, fourth and fifth prayers. The plaintiffs excepted. Verdict and judgment thereon being rendered for the plaintiffs for $1032.50, the plaintiffs appealed.

The cause was argued before BARTOL, C. J., BRENT, MILLER, ALVEY, GRASON and ROBINSON, J.

*R. S. Mathews* and *S. T. Wallis,* for the appellants.

1st. So far as the prayers are concerned, all exceptions are narrowed down to the refusal of the Court to grant the first of the appellants' and its granting of the second of the appellee. The law, therefore, of the case, as it was propounded by the Court, is to be deduced from the propositions set forth in the latter. It was the only prayer granted on either side which was operative on the minds

of the jury. As it is intended to set up an "estoppel" against the plaintiffs by reason of their acquiescence in the balances of July 13th and October 6th, and as the estoppel relied on depends solely upon "implied" acquiescence, rather than upon any evidence of the appellants' knowledge of the falsified condition of their bank and check-books, it will be necessary for the appellants to examine the doctrine of estoppel as it has been elucidated by the decisions of this Court, and of others, and to see how far, according to the authority of such decisions, the Court below was right in its view of the law. It is unnecessary for us to advert to any other testimony than just so much as bears upon the facts set forth in this second prayer. It is conceded that the bank-book was balanced on the 13th of July, and it is proven that the forgeries remained undetected until the 10th of October. The amounts of five checks charged against the appellants on their bank-book, in Holmes' handwriting, which had been paid by the bank to Holmes on checks forged by him, were recovered by the verdict of the jury. The amounts paid out on nine other forged checks, amounting to a much larger aggregate, were not included in the verdict. Nor did this prayer advert to "missing" checks, upon which large amounts had also been paid.

Upon a careful scrutiny of the whole structure of this second prayer, it is notable that it is nowhere pretended, from its first line to its last, that the appellee was *misled* or deceived to its injury by the acquiescence of the appellants in the balances of July 13th. It is not incumbent upon us to take any notice of the balance of October 6th, or of any implied acquiescence therein, because all the forgeries at issue, ended prior to that balance, and there can be no pretence that anything which grew out of that balance had any sort of influence upon or relation to the antecedent forgeries which are the subject-matter of this suit.

If any conduct of the appellants had deceived, misled or injured the appellee it must have occurred within the period between July 13th and October 6th; and it is frankly admitted here that the appellants might more justly be "estopped" from setting up a claim against the appellee for money paid on forged checks, if the conduct, admissions, or actions of the appellants had, in fact, induced the appellee to honor these forged checks. But such conduct, admissions, or actions, must be shown to have been willful, intentional and intelligent on the part of the appellants; and cannot be set up by mere implication on account of their silence or their tacit acquiescence in a condition of things about which they were as ignorant as the appellee, and which could not have misled at all, but for the primary and culpable negligence of the agents and servants of the appellee.

The estoppel is made to consist in three things, viz., two balances of the bank-book, and the fact that the forgeries were committed by the confidential clerk of the appellants; and in these three things, without leaving it to the jury to find whether or not the appellee was misled by either or all of them to its injury; in other words, this prayer is tantamount to the declaration that it is the business of a mercantile house to discover the forgeries of its name by its confidential clerk, and to notify its bank of such discovery, and that unless such discovery be made by the employers, of the misconduct of their agents, and the bank be put by them on its guard, the latter will be held guiltless of negligence, and be entitled to rely upon the employers' neglect as a ground of "estoppel" upon which to resist the payment to them of money deposited with the bank. As the relation between its customer and the bank is that of creditor and debtor, it must be borne in mind that when it pays out money on a forgery, it pays its own money and not the customer's. It owes the customer a debt, which is not liquidated by a payment to a

third party without his authority. The bank is not a bailor, but a debtor. The prayer, therefore, shifts the burden of vigilance from the bank to the depositor, which is contrary to the accepted law regulating their relations and duties and obligations.

Let us first endeavor to see how far the balancing of July 13th imports an acquiescence by the appellants in the forgeries of Holmes—not an acquiescence only in the correctness of the account—but, by construction of law, if the appellee's second prayer is good, in the forgeries themselves. "The chief value of the bank-book," says Mr. Morse, (*Morse on Banking*, 48, 49,) " is, that the depositor may have a check upon the bank, *and may use it as evidence upon the occurrence of any dispute and law suit*. The entries in the bank-book bind the bank as admissions; the balancing is conclusive against the bank as an account stated. The entry of the credit is, after all, only a receipt, and as such is open to explanation by evidence *aliunde*." *Manhattan Co. vs. Lydig*, 4 *Johns.*, 399; *Union Bank vs. Knapp*, 3 *Pick.*, 96.

The balancing of the book and the return of the paid checks have for their objects, to put the depositor in the way promptly to discover and demand correction of any mistake. *Morse*, 49, 51; *Weisner vs. Denison*, 6 *Seld.*, 68.

" A bank which receives money on deposit, and thence derives profit, *is justly* held to the obligation to know the signature of its depositors to their checks; and if it pays in mistake a forged check, there is no reason why the loss should be shifted to another innocent party, upon whom the law casts no such obligation," &c. *C. and F. Nat. Bank vs. First Nat. Bank*, 30 *Md.*, 11-28; *Morse*, 295, 310; 311; *Sutton vs. Turner*, 7 *B. & C.*, 416; *Jones vs. Fleming, Ib.*, 217; *Maltby vs. Carstairs, Ib.*, 785: *Young vs. Grote*, 4 *Bing.*, 258, 17 *Mass.*, 33; *Hall vs. Fuller*, 5 *B. & C.*, 750; *Pott vs. Clegg*, 16 *M. & W.*, 321; *Wilkinson vs. Johnston*, 3 *B. & C.*, 428; *Hull vs. Huse*, 10 *Mass.*, 40, (a case of a

promissory note;) *Salem Bank vs. Gloucester Bank,* 17 *Mass.,* 1, (a case of bank bills;) *Barker vs. Gingell,* 6 *Esp.,* 60; *Dezell vs. Odell,* 3 *Hill,* 215; *Pickard vs. Sears,* 6 *Ad. & El.,* 469; *Leach vs. Buchanan,* 4 *Esp.,* 226; (See *Morse,* 294–311, for a succinct and lucid treatment of all questions relating to "forgeries" as between the bank and its customer.) *American Law Times, June,* 1877; *Cole vs. Bank of England,* 37 *Eng. Com. Law,* 134; 11 *M. & W.,* 542; 6 *M. & Roscoe,* 711.

2. Have the appellants been guilty of such acts or admissions as in law will amount to an *estoppel* of their right to assert that the law regulating the duty and obligation of the bank to know the signatures of its customers, against the theory of defence set up in the appellee's second prayer? it must be conceded that the burden of proving such misconduct is on the appellee. It must be clearly shown that there was culpable conduct on the part of the appellants; and we contend that even if acquiescence in the accounts be established by competent testimony, it must be further shown with equal clearness that it, and it alone, led to the payments made by the appellee on the forged checks.

1st. Holmes was a confidential clerk; he had charge of the cash, bank and check-books; it was within the scope of his duty to draw checks, to enter them on the bankbook, to make deposits, to present and receive payments on checks at the bank, and generally to attend to the financial part of the appellants' business. He had no authority to sign checks, and never signed one by authority.

2nd. How, are the appellants bound by the misconduct of Holmes and how is the appellee relieved because the forgeries were skilfully executed by a confidential agent of the appellants, rather than by some stranger? It will be observed from an analysis of the testimony that the appellee defended the case below on two grounds: the first,

that the checks were not forgeries at all; and the second, that even if they were forgeries, the appellee was relieved from liability, because the bank-book had been balanced without dissent upon the part of the appellants, although it was not proven that they knew the real facts.

There must be some element of common honesty in the doctrine of estoppel. It is not arbitrary, eccentric and vacillating. It has its roots in equity, its flower and consummation in good conscience and right dealing between man and man.

This Court has manifested its discriminating appreciation of the force and rightfulness of this doctrine, its *rationale*, as well as its *morale*, in more than one recent and noteworthy decision. See *Reynolds vs. Mut. F. Ins. Co.*, 34 *Md.*, 289; *Howard vs. Carpenter*, 11 *Md.*, 259; *Homer vs. Grosholz, et al.*, 38 *Md.*, 525; *Bramble vs. State*, 41 *Md.*, 440; *Gusdorf vs. Mut. F. Ins. Co.*, 43 *Md.*, 514; *Brown, et als. vs. H. F. Ins. Co.*, 42 *Md.*, 291; *Starr vs. Yourtee*, 17 *Md.*, 251; see 12 *Wallace*, 64; *Murray's Case*, 6 *Otto*, 544; *Ketchum vs. Duncan, Ib.*, 659; *Morgan vs. R. R. Co., Ib.*, 716; see also, *Herman on Estoppels*, 337; *Freeman vs. Cooke*, 2 *Exch.*, 654; 18 *L. J.*, (*Ex.*,) 117; *Swan vs. N. B. Australasian Co.*, 2 *H. & C.*, 175, 181; 32 *L. J.*, (*Ex.*,) 273. The representation, to amount to an estoppel, must be wilful, and made with intent that it shall be acted upon by the party to whom it is made. *Pickard vs. Sears*, 6 *Ad. & E.*, 469; *Gregg vs. Wells*, 10 *Ib.*, 90; *Evans vs. Collins*, 5 *Q. B.*, 804.

BRETT, J., in *Carr vs. L. & N. W. R. Co.*, 10 *L. R. C. P.*, 316, says: "If, in the transaction itself which is in dispute, one has led another into the belief of a certain state of facts by conduct of culpable negligence calculated to have that result, and such culpable negligence has been the proximate cause of leading, and has led the other to act by mistake upon such belief, to his prejudice, the second cannot be heard afterwards, as against the first, to

·shew that the state of facts referred to did not exist."
See 1 *L. R. C. P.*, 578; *Bank of Ireland vs. Evans'
Charities*, 5 *H. L. C.*, 389; *Arnold vs. Cheque Bank*, 1
*L. R. C. P. Div.*, 587-8-9; *Same vs. City Bank, Ib.*

For a thorough discussion of the principles underlying
the doctrine of estoppel, see *Herman on Estoppels*, 334–357;.
*Hamilton vs. C. R. R.*, 44 *Md.*, 551; *Whiteford vs. Munroe*,.
17 *Md.*, 149, 153; *Brandt vs. Va. C. & I. Co.*, 3 *Otto*, 335,.
336.

It cannot be contended that the balance of July 13th
operated as an account stated. The verdict covered the
forgeries up to that date, and the appellee has no cross-
appeal therefrom. If it be insisted that the balance of
October 6th has that effect, and we cannot see how that
question can be raised under the appellee's only prayer, it.
will be maintained that any stated account may be
opened when you can lay your finger on error or fraud
within reasonable time. 2 *Atkyns*, 113, 119; 2 *Broth. Ch.*,
62; 3 *Austr.*, 769; 4 *Vesey, Jr.*, 118; 6 *Ib.*, 485; 1 *Salkeld*,.
282; 3 *Pick.*, 396; 1 *Taylor on Ev.*, 765; 66 *Barb.*, 390;.
7 *W. Va.*, 505; 26 *Graham*, 612; 1 *D. & B.*, (*N. S.*,) 464.

Mr. Taylor says, (page 765,) that bankers' pass-books,
on the authority of *Commercial Bank of Scotland vs. Rine*,
3 *Macg. Sc. Cases, H. of L.*, 643, *not having been acted
upon by another to his prejudice*, are not conclusive against
the holder, but are left at large, to be weighed by the
jury. 1 *Taylor on Ev.*, 105; 2 *Smith's L. C.*, 670–683;.
*Story's Eq. Pl.*, sec. 798; *Story's Jurispr.*, secs. 523, 526,
528.

For additional cases on the point of estoppel, as applied
to dealings with banks, see *Fraser vs. Essex Bank*, 17
*Mass.*, 478; 2 *Comstock*, 479; *Gloster Bank*, 17 *Mass.*, 1;
19 *Johnson*, 116; *Morse on Banking*, 294-6-7-8; 3 *Com-
stock*, 230; 1 *Hill*, 283, 298; *Hall vs. Huse*, 10 *Mass.*, 40;
*Prescott's Case*, 9 *Bingham*, 21; 2 *Daley*, (*N. Y.*,) 287;
*Blackburn on Sales*, 163, (*L. L.*, 571;) *Davis vs. Bank of*

*Eng.*, 9 *Eng. C. L.*, 444; *Union Bank vs. Knapp*, 3 *Pick.*, 96; *R. R. vs. Dubois*, 12 *Wall.*, 64; *Howard vs. Hudson*, 75 *Eng. C. L.*, 1; 22 *Pa.*, 431; *Larken's Appeal*, 38 *Pa.*, 458–9; *Levy on Bank of U. S.*, 4 *Dallas*, 223; *Taylor on Ev.*, *secs.* 781–6; *L. R.*, 5 *Q. B.*, 660, 665; *Parkersburg Cases*, 39 *Md.*, 81, 83.

The appellants referred, on the points of evidence, to *Act of* 1876, *ch.* 222; *Johnson and Wife vs. Heald's Ex'r*, 33 *Md.*, 353; *Milwaukie R. R. Co. vs. Kellogg*, 4 *Otto*, 472, 3; 1 *Wharton's Ev.*, *secs.* 508, 509; *Higgins vs. Carlton*, 28 *Md.*, 137.

*George Hawkins Williams* and *I. Nevitt Steele*, for the appellee.

On the points of evidence the appellee referred to *Hanna vs. Wray*, 77 *Penn. State*, 27; *Miller vs. Motter*, 35 *Md.*, 432; *Spence vs. Trafford*, 42 *Md.*, 17; *Richardson vs. Wilkins*, 19 *Barbour*, (*N. Y.*,) 510; 1868, *ch.* 116.

The ninth exception presents the main point in the case, by the plaintiffs' first prayer and the defendant's second prayer qualifying it. The defendant's prayer is based on no fact that is disputed, and instructs the jury that if Holmes was the agent of plaintiffs to keep and state the bank account, and to enter the checks, and did so for the successive balances of the book, and therein *did* enter all these checks, that then, though the plaintiffs might recover the amount of the first five checks in the first balance alleged to be forged, yet the affirmance of such accounts, and the subsequent dealings of the bank in continuance of such accounts, and in good faith paying checks on the similar signatures, without any intimation from the plaintiffs of anything wrong, was such an affirmance of Holmes' acts by their negligence that they were not entitled to recover. *Cole vs. Bank of England*, 37 *Eng. C. Law R.*, 134; *Young vs. Grote*, 4 *Bing.*, 253, (13 *Eng. C. L.*, 420;) *DeFeriet vs. Bank of America*, 23 *Louisiana Annual*, 310; *Tome vs. Parkersburg R. R.*,

39 *Md.*, 83, 84, 101; 5 *Q. B.*, 660, (*L. R.*;) 4 *B. & C.*,
281; *Pickard vs. Sears*, 6 *A. & Ell.*, 469, (33 *Eng. C. L.*;)
*Freeman vs. Cooke*, 2 *Exchg.*, 654; *Ex parte Swan*, 7 *C.
B.*, (*N. S.*;) 429, (97 *Eng. C. L.*;) *Bank of Ireland vs.
Evans' Trustees*, 5 *H. of L. Cases*, 389; *Taylor vs. Great
Indian P. R.*, 4 *De Gex & J.*, 559.

ALVEY, J., delivered the opinion of the Court.

This action was instituted by the appellants against
the appellee to recover an alleged balance due on bank
account.  The appellants were customers of and deposi-
tors in the bank of the appellee; and the appellants hav-
ing been notified that their account was overdrawn, upon
investigation, they discovered, as they allege, that a con-
siderable amount that had been paid out on their account
had been paid out on forged checks, and that, by a proper
balancing of the account as of the 10th of October, 1873,
there was a balance of $6,113.37 then due them; and it
was to recover that amount that this action was instituted.

In the course of the trial below, several questions were
raised and decided; some upon the introduction of the
evidence, and others upon the prayers offered by the parties
for instructions to the jury.  We shall first consider the
questions raised by the prayers, so far as those questions
are presented by the exceptions taken by the appellants.

At the trial below, there were fourteen checks produced
which were alleged to be forgeries on the appellants, and
which had been paid by the appellee.  These checks were
all entered in the appellants' bank-book, containing the
account between the appellants and the appellee.  Five
of these checks, amounting to $860, were included among
the checks entered in the bank-book at the time it
was written up and balanced on the 13th of July, 1873;
and the remaining nine checks, amounting to $1296,
were dated, presented and paid, between the 13th of July,
1873, and the 6th of October, 1873, at which latter date

the bank-book was again written up and balanced. Upon each occasion of writing up and balancing the bank-book, the cancelled checks were returned to the appellants, and the balance ascertained carried forward to their credit. Holmes, the alleged forger, was the confidential clerk and book-keeper of the appellants, and all the checks produced and alleged to have been forged were taken from the regular check-book of the appellants, and were filled up in the handwriting of Holmes. He was entrusted with the care of the appellants' bank-book, their check-book, and with the checks returned by the bank; and he entered in the bank-book all the checks paid by the bank, except the four last. It was his business to enter the checks in the bank-book and to superintend the writing up and balancing the account with the bank, and to keep himself informed of the true state of the account. It was not until about the 10th of October, 1873, upon being notified that their account with the bank had been over-drawn, that the appellants, as they allege, first discovered that Holmes had forged checks and drawn money on their account.

Upon proof of these facts, the appellants claim that, under well established principles of law, they were entitled to recover the entire amount of the fourteen checks produced, if in fact they were forgeries; and that the Court below was in error in refusing to grant their first prayer, which asserted this right. On the other hand, the appellee sought to maintain two distinct grounds of defence; first, that the checks alleged to be forged were not forged at all, but were the genuine checks of the appellants; and second, that, assuming the checks to be forged, there was such negligence, and apparent acquiescence, on the part of the appellants, as to induce the belief that the alleged forged checks paid after the 13th of July, 1873, were genuine, and that, therefore, the appellants are estopped to question the genuineness of the

checks, or the authority of Holmes to draw them in the name of the appellants.

With respect to the first ground of defence, that was fully covered by the last prayer offered by the appellee, and which was conceded by the appellants. Of course, if the checks were not forged, there was no ground for the appellants' action; and it was quite correct to instruct the jury, as was done by this conceded prayer, that if they should find that the bank-book of the appellants had been balanced, and the checks returned by the appellee to the appellants, and no objection was made to their payment, then, as to such checks, the burden of proof was on the appellants to show the alleged forgery.

But with respect to the second ground of defence, the appellee, by its second prayer, which was granted as a qualification of the first prayer offered by the appellants, obtained an instruction to the jury, that though the appellants might be entitled to recover the amount of the first five of the fourteen checks alleged to have been forged, being those prior to the 13th of July, 1873, yet, in respect to the other nine, the acceptance of the balanced account in the bank-book by the appellants, containing entries made by Holmes of the forged checks, with the cancelled checks upon which such balance was struck, and the continuous dealing with respect to such balance, and the condition of the account—the bank in good faith paying the checks on similar signatures, to those on checks embraced in the former settlement of the account, without suggestion or intimation from the appellants that any thing was wrong—are facts sufficient to estop the appellants to question the genuineness of the checks, or the authority of Holmes to draw them in the form in which they were presented. It was to the granting of this prayer, as well as to the refusal to grant the first prayer offered by the appellants without qualification that the latter excepted.

Hardy & Bros. *vs.* Chesapeake Bank.

1. It is now perfectly well settled, that the relation between banker and customer, who pays money into the bank, or to whose credit money is received there on deposit, is the ordinary relation of debtor and creditor; and that when the bank receives the money as an ordinary deposit and gives credit to the depositor, the money becomes the funds of the bank, and may be used by it as any other funds to which it may be entitled. It is accountable for the deposits that it may receive as debtor, and in respect to ordinary deposits there is an implied agreement between the bank and the depositor that the checks of the latter will be honored to the extent of the funds standing to his credit. *Horwitz vs. Ellinger*, 31 *Md.*, 492, 503; *Foley vs. Hill*, 2 *C. & Fin.*, 28; *Thompson vs. Riggs*, 5 *Wall.*, 663; *Bank of the Republic vs. Millard*, 10 *Wall.*, 152, 155. There is no question of trust, therefore, between the parties, but their relation is purely a legal one; and if the bank pays money on a forged check, no matter under what circumstances of caution, or however honest the belief in its genuineness, if the depositor himself be free of blame, and has done nothing to mislead the bank, all the loss must be borne by the bank, for it acts at its peril, and pays out its own funds, and not those of the depositor. It is in view of this relation of the parties, and of their rights and obligations, that the principle is universally maintained, that banks and bankers are bound to know the signatures of their customers, and that they pay checks purporting to be drawn by them at their peril. *Com. & Farm. Nat. Bank vs. First Nat. Bank*, 30 *Md.*, 11. No right or title can be legally claimed through a forgery; and the possession by the bank of a forged check upon which money has been paid, affords of itself no ground for claim of credit in account as against the party whose name has been forged.

But while these are the strict and necessary rules as against banks and bankers, their operation may be varied

by the acts and conduct of the parties for whose benefit and protection they are intended to be enforced. If, for instance, a customer of a bank, having a deposit account, and who is in the habit of drawing checks upon that account, should, by words or acts, cause the bank, the latter acting upon such reasonable grounds as prudent business men generally act, to make payment on a forged check, such customer would not be allowed, as against the bank, to set up the forgery that he, by his conduct, had induced the bank to act on as a genuine check. This is the principle sought to be applied by the second prayer of the appellee; the latter insisting that it had been misled and induced to honor and pay the checks drawn by Holmes, by the negligent conduct and apparent acquiescence of the appellants. But it is objected by the appellants that the prayer as granted by the Court is fatally defective, because of the omission to submit to the jury the question, whether the appellants were, in point of fact, guilty of negligence in respect to the bank account, and whether, if there was negligence at all, that negligence was of a character to mislead, and did actually mislead, the appellee, and induced it to act upon the belief that, as all the checks paid prior to the 13th of July, 1873, and which had been returned to the appellants, remained without objection, all checks similarly drawn and presented for payment after that date were unobjectionable. The instruction certainly does omit to put this question distinctly to the jury, and whether it be for that reason defective remains to be determined.

It must be borne in mind that the appellants were not bound at their peril and under all circumstances to detect the forgery. They were simply bound to refrain from doing any act that would reasonably have the effect of misleading the appellee to its hurt or injury, and not fail to do any act that positive duty required them to do for the protection of the appellee. When the bank account

was balanced in the bank-book on the 13th of July, 1873, and the book and the cancelled checks were returned to the appellants, after the lapse of a reasonable time, (within which the checks and account could have been examined and compared,) without objection being made, the presumption arose that the account as balanced, and also the checks charged therein, were all correct. This presumption, however, proceeds upon the ground simply of an implied admission, and is only *prima facie* in its effect. *Wiggins vs. Burkham,* 10 *Wall.,* 129. Such presumption arises from the natural and usual habits of careful business men to examine and scrutinize such accounts when rendered; but the presumption is liable to be repelled, by showing that the error or fraud complained of was not discoverable by the exercise of reasonable care and diligence, or that there was no such appearance of things as to excite the suspicion of a reasonable man, or that, for any reason, the party had not had an opportunity to examine the account. *Weisser vs. Denison,* 10 *N. Y.,* 68, 76; *Nat. Bank vs. Whitman,* 94 *U. S.,* 343, 346.

It is insisted, however, that as Holmes was the confidental clerk of the appellants, and was entrusted to make the entry of all checks in the bank-book, and did make the entries as well of the forged checks as all others, he acted as the agent of the appellants, and his acts and his knowledge in respect to these entries are to be taken as the acts and the knowledge of the appellants themselves; and upon this imputed knowledge they should be taken to have acquiesced in the entries of the forged checks.

And therefore, as to the fact of knowledge on the part of the appellants, it was only necessary that the jury should be required to find that the forged checks were entered in the bank-book by Holmes, the alleged forger, in order to find and conclude the appellants. But it is clear, we think, such position can neither be supported upon principle or authority.

It is conceded that Holmes did not act as agent in drawing the checks; and if the appellants are not liable in respect to the fraudulent drawing, we do not perceive upon what principle they can be bound or made liable in respect to the fraudulent entry of those checks in the bankbook. Holmes was not an agent for any such purpose, and the principle is too well settled to require the citation of authorities for its support, that the principal is bound by the acts of his agent only so far as the agent acts within the limits and scope of his employment. The fraudulent knowledge of the agent in regard to acts and transactions outside of and beyond his employment cannot be imputed to his principal. To do so would work the grossest injustice, and lead to the most anomalous consequences. In the case of the *Manhattan Co. vs. Lydig*, 4 *John.*, 377; this question was distinctly presented and decided. In that case, it was contended that the fraudulent entries in the ledger of the bank, and those in the customer's bank-book, made by the book-keeper of the bank, were acts that bound the bank. But the Court expressly decided otherwise. So, in the case of *Weisser vs. Denison*, 10 *N. Y.*, 68; a case in many of its circumstances almost exactly similar to the circumstances of the present case, there it was insisted as here, that as the confidential clerk of the plaintiff settled the account with the bank as the agent of the plaintiff, the agent having knowledge of the forgeries, and that the charges in dispute were based upon such forgeries, the principal was affected by the knowledge of the agent, and should be deemed to have acted in person, with full knowledge of all the facts, and thus to have acquiesced in the payment of the forged checks from his funds. But the Court was explicit in overruling the position, citing the authorities in support of their ruling. Indeed, if the position contended for here by the appellee be maintainable, the same principle would have afforded a short answer to the demands of the plain-

Hardy & Bros. *vs.* Chesapeake Bank.

tiffs in many of the cases that have been referred to in argument; but in none of them was it intimated by the Courts that such a doctrine could be supported. Moreover, if the principle contended for by the appellee be sound, it is a little difficult to understand why it should have been conceded by the appellee's second prayer, that recovery could be had for the first five of the forged checks; for if the acts and knowledge of the agent in making the entries of those checks in the bank-book could be properly imputed to the appellants, irrespective of knowledge in fact, those entries would amount to a ratification and adoption of the acts of Holmes in drawing those checks, as well as those dated subsequent to the 13th of July, 1873.

We therefore think that the jury should have been required to find either that the appellants had knowledge in fact that the forgeries had been committed, or that, from carelessness and indifference to the rights of others, they failed to inform themselves from sources of information readily accessible to them, and which, by the exercise of ordinary diligence as business men, would have disclosed to them the fact that the forgeries had been committed. If such facts be found to exist, then it must be also found, in order to work an estoppel, that the appellee acted, in honoring and paying the nine checks in question, in reference to the conduct of the appellants in failing to make known an objection to the account as stated and balanced in the bank-book on the 13th of July, 1873, and that such omission and neglect of the appellants did in fact mislead the appellee into the error of paying the nine forged checks now in dispute.

This doctrine of estoppel *in pais* is applied in a great variety of circumstances, but its great object is to prevent injustice being done, where one party has been led into error by the fault or fraud of the other. It is a most valuable doctrine for the promotion of justice; but it can have no application except where the party invoking it

can show that he has been induced to act or refrain from acting, by the acts or conduct of the adverse party, under circumstances that would naturally and rationally influence ordinary men. It can, therefore, only be set up and relied on by a party who has been actually misled to his injury; for if not so misled he can have no ground for the protection that the principle affords. The doctrine has been applied in many cases by the Court, though under circumstances unlike those of the present case. *Alexander vs. Walter*, 8 *Gill*, 252; *Homer vs. Grosholz & Coquentin*, 38 *Md.*, 520, 526; *Bramble vs. State, use of Twilley*, 41 *Md.*, 435, 441; *Brown, Lancaster & Co. vs. Howard Fire Ins. Co.*, 42 *Md.*, 385; *Hamilton vs. Central O. R. Co.*, 44 *Md.*, 551, 561. In all these cases the essential conditions of the application of the principle as heretofore stated have been recognized. In England, the leading case upon the subject is *Pickard vs. Sears*, 6 *Ad. & El.*, 469; but the doctrine would appear to be more clearly and comprehensively stated in *Freeman vs. Cook*, 2 *Exch.*, 654; than in any previous case. In that case, PARKS, B., in a carefully expressed judgment for the whole Court, stated the doctrine in these terms: "If, whatever a man's real intention may be, he so conducts himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it, and did act upon it as true, the party making the representation would be equally precluded from contesting its truth; and conduct, *by negligence or omission, where there is a duty cast upon a person, by usage of trade or otherwise,* to disclose the truth, may often have the same effect." This statement of the doctrine has been fully approved and adopted in subsequent cases, after elaborate discussion, as appears from the case of *Swan vs. N. B. Australasian Co.* 2 *H. & Colt.*, 175, 181; decided in the *Ex. Ch.*, and again in the case of *Carr vs. L. N. W. R. Co.*, *L. Rep.* 10 *C. P.*, 307. In the latter case, the principle was formulated in respect to acts of

negligence and omission, thus: " If, in the transaction itself which is in dispute, one has led another into the belief of a certain state of facts by conduct of culpable negligence, calculated to have that result, and *such culpable negligence has been the proximate cause of leading, and has led, the other to act by mistake upon such belief to his prejudice,* the second cannot be heard afterwards, as against the first, to show that the state of facts referred to did not exist." And in the recent case of *Arnold vs. The Banks, L. Rep.,* 1 *C. P. Div.,* 578, where the principle was extensively discussed as to its application to the negligent conduct of the party suing, it was held, following the previous cases that negligence, to create an estoppel, must be in the transaction itself, and be the proximate cause of leading the third party into mistake, and also must be the neglect of some duty which is owing to such third party, or to the general public. What is such duty may not in all cases be easy to determine, but we think it not too much to say, that in a case like the present, there is a duty owing from the customer to the bank to act with that ordinary diligence and care that prudent business men generally bestow in such cases, in the examination and comparison of the debits and credits contained in his bank or pass-book, in order to detect any errors or mistakes therein. More than this, under ordinary circumstances, could not be required.

And having said this much in regard to the leading principles involved in the case, it remains to notice some of the authorities most relied on by the counsel of the appellee, in the course of their argument. The case of *Coles vs. The Bank of England,* 10 *Ad. & El.,* 437, much pressed upon us, is no longer an unquestioned authority. From what was said of it in the case of *Evans vs. Bank of Ireland,* 5 *Ho. L. Cas.,* 389, and in *Swan vs. N. B. Australasian Co.,* 2 *H. & Colt,* 175, serious doubt has been thrown upon the case as an authority. But, without discussing the question of the soundness of the decision, that was a

case where it was alleged that certain acts done without authority at the time, were subsequently ratified by the acts and conduct of the party in whose name the original acts were done. The validity of the acts in controversy were those alleged to have been ratified. That is not the question in this case; and consequently, the case of *Coles vs. The Bank of England,* has no application here.

The case of *De Feriet vs. Bank of America,* 23 *La. An.,* 310, also much relied on, is quite distinguishable from the present. There, when the first check was forged by the plaintiff's confidential clerk, and paid by the bank, the plaintiff was notified of the draft upon his account, and went at once to the bank, and upon being shown the check, while he stated that he had not signed the check himself, he refused to denounce it as a forgery. After seeing the clerk, the plaintiff reported back to the bank that the check was all right. The clerk made deposits to make the check good, and the plaintiff himself drew upon the deposits thus made. He continued the forger in his employ; and subsequently the same clerk forged another check, which the bank paid, and upon discovery of the second forgery the plaintiff denounced it. But it was held, that, by his conduct in ratifying the act of the clerk in drawing the first forged check, the plaintiff was precluded from holding the bank liable for the payment of the second; that the bank was misled by the approval and ratification of the first forgery, and that it was therefore excusable for paying the second forged check drawn in all respects similar to the first. In that case, there was no question as to the want of knowledge on the part of the plaintiff of the first forgery committed by the clerk, and his full ratification and adoption of the act; nor was there any in regard to the fact that the bank had been misled. In the present case, those are controverted questions, to be passed upon by the jury; but which were not submitted to be so found by the appellee's second prayer.

The appellants have also made an objection, by special exception, to the *legal* sufficiency of the evidence produced, assuming it to be true, to create an estoppel. But, without going over all the circumstances of the case, we think the whole evidence ought to be submitted to the jury to be weighed by them. It is not for this Court to say whether the evidence bearing upon the question of estoppel be weak or strong; we are only called upon to say whether there be any evidence *legally* sufficient to be submitted to the jury for their consideration; and in this case we think the evidence should go to the jury. It results from what has been said, that, in the opinion of this Court, there was error in granting the appellee's second prayer, but none in refusing the appellants' first prayer, in the form in which it was offered.

Having thus disposed of the main questions arising upon the prayers, it remains for us to determine the several questions presented in the exceptions as to the admissibility of evidence.

2. The first of these is as to the admissibility of the appellants' check-book. The witness, Kinsley, a clerk of the appellants, had testified as to the examination made, upon receipt of notice by the appellants of the overdrawing of their account at the bank, for the checks corresponding to the entries made in the bank-book by Holmes, and that all the checks found and produced that were supposed to be forged were taken from the regular check-book of the appellants; and the check-book was then produced and shown to the witness, and he was asked "whether the stubs of the same showed any or either of the alleged forged checks produced?" to which question the appellee objected, and the appellants then offered their check-book in evidence to prove thereby, and by the testimony of the witness in connection therewith, that several of the checks offered in evidence and alleged to be forged, were not entered upon the stubs of said check-

book, and did not appear thereby to have been issued; but the appellee objected, and the Court sustained the objection, and refused the offer thus made.

As we have already shown, the question before the jury was as to the existence of negligence on the part of the appellants in failing to discover the fact of the perpetration of the forgeries, and in not imparting knowledge of that fact to the appellee in time to guard it against the subsequent similar forgeries by Holmes. It is insisted by the appellee that it was the duty of the appellants to have examined their check-book, and that knowledge is to be imputed to them of everything that that book, upon an ordinary examination, would have disclosed. The question then is, whether the check-book, upon its face and by an ordinary inspection, would have disclosed any such *indicia* or traces of the fraud as should have excited the suspicion of a reasonably careful man, and led to a thorough investigation of all the checks entered in the book, and the actual condition of the bank account. The book was offered for the purpose of showing, not the truth of any entry therein, or the fact that any particular entry had been therein made, but that there was not in fact anything disclosed therein, upon ordinary inspection, calculated to excite suspicion that a fraud had been committed by the party in whose custody it had remained; and for that purpose we think the book was admissible. It was admissible we think, upon the same principle that a banker's ledger is receivable in evidence to show that a customer had no funds in the banker's hands. In the case of *Furness vs. Cope*, 5 *Bing.*, 114, the action was brought by an assignee in bankruptcy to recover money alleged to have been received by the defendant under a fraudulent preference. In order to show the state of the affairs of the bankrupt just before his bankruptcy, the plaintiff produced the ledger of the banker with whom the bankrupt kept his cash account. The entries in the

book had been made by various persons; and upon objection by the defendant, while it was conceded by the Court that the entries in the ledger were not affirmative evidence against the defendant, it was decided that the ledger was admissible to prove the negative, that is to say, that the bankrupt had no funds to his credit at the time of his bankruptcy in the hands of his banker.

But while we determine the check-book to be admissible under the offer and for the purpose stated in the first exception, we think the Court below was right in rejecting it under the appellants' offer as stated in the seventh exception. There is nothing to show that the memorandum referred to was made exclusively from the showing of the check-book, or that it was not made with respect to other sources of information within the control and knowledge of Mr. Hardy, one of the appellants. And that being the case, it is quite clear, the check-book could furnish no legitimate evidence to rebut any inference that might be drawn from the memorandum sent to the bank. There was no error, therefore, in the ruling as stated in the seventh exception.

3. The ruling as stated in the second exception we think entirely correct. The witness was asked by the appellants if, in making the search for the checks, he had examined the books of the appellants to ascertain whether the amount of the alleged forged checks had passed into the funds of the firm, and been applied to their use, and if so, what was the result of such examination; offering at the same time to produce the books. Though the books might not show that the amount of these checks had passed into the funds and business of the firm, it does not of necessity follow that such was not the fact, nor that the money might not have been applied by the appellants to purposes outside of their partnership transactions. Moreover, the mode proposed of getting the result of the examination of the books before the jury is sanctioned by no established principle of evidence.

4. The next ruling to which exception was taken was that by which the confession of Holmes, the supposed forger, was rejected upon the offer of the appellants. We have been referred to no authority that would justify the admission of this confession, and we suppose none could be found. Upon no principle, within our knowledge, could it have been admitted as against the appellee. The authorities are express upon the subject, and all concur in holding that such evidence is not admissible as against third parties. 1 *Phill. Ev.*, (6th *Am. Ed.*,) 77; 1 *Tayl. Ev.*, 807; 1 *Whart. Ev.*, sec. 175, and the cases there collected.

5. The fourth exception presents the question of the competency of one of the appellants as a witness on his own offer. Thomas A. Hardy, Sr., one of the original co-plaintiffs, having died after the institution of the action, his death was suggested before the trial below; and when Edward M. Hardy, one of the surviving co-plaintiffs, was offered as a witness, his competency was objected to by the appellee, except for particular and special purposes, designated in the objection. It is contended for the appellants that there is nothing in our statutes in relation to the competency of parties as witnesses, when rightly construed, that should exclude the party under the circumstances of this case; that he is not embraced by the exception contained in the second section of the Act of 1864, ch. 109, as that section has been amended and re-enacted by the Act of 1876, ch. 222; and upon careful consideration we are of that opinion.

By the first section of the Act of 1864, ch. 109, the incompetency of persons to be witnesses, by reason of interest or crime, was removed; and the parties litigant were thereby made competent to testify in their own behalf and on their own offer. This general provision is qualified by the exception contained in the second section of the Act, which provides, that when an original party to a contract

or cause of action is dead, or shown to be lunatic or insane, or when an executor or administrator is a party to the suit, etc., either party may be called as a witness by his opponent, but shall not be admitted to testify on his own offer, or upon the call of his co-plaintiff or co-defendant, otherwise than now by law allowed, unless a nominal party merely. In construing this provision of the statute, this Court has said, in the case of *Johnson vs. Heald*, 33 *Md.*, 352, 368, that it was the design of the Legislature, in admitting parties to suits to testify at their own instance, to provide that they should do so on terms of perfect equality as to knowledge or means of knowledge of the subject-matter of controversy about which they were to speak. Hence, if one be dead or insane the other cannot testify on his own offer. Indeed, the whole object and design of the exception made by the second section of the Act, was to put parties on a footing of equality, and not allow a living party to testify to his version of the transaction when he could not be confronted by the other or adverse party, with whom the actual transaction took place, in consequence of the death or insanity of the latter. And the general provision, removing the incompetency of parties, should not be restricted farther than this reason for the exception requires. Where, therefore, a contract is made with a partnership composed of a great number of persons, some of whom are active in the business and others not, or some of them reside abroad, and have no personal knowledge of the transactions of the firm, in such case, it would neither comport with the design of the Legislature, nor the reason of the thing, to exclude the parties to the actual transaction, simply because one of the non-active or non-resident technical co-contractors should happen to die after the contract was made.

Acts substantially the same as our own are in force in nearly all the States of the Union, and we have found no decision, among the great many that have been made

upon the construction of those Acts, that would exclude the party offered as a witness, under the circumstances of this case. On the contrary, it would appear that, upon the construction adopted, the party would be clearly a competent witness. *Wharton*, in his recent work on *Evidence*, (*vol.* 1, *secs.* 463 *to* 475,) has brought together the provisions of the statutes of the several States upon this subject, and the decisions made thereon; and in section 469 of his text, in speaking of the exception in those statutes corresponding to that under consideration in this case, he says: "The exception does not incapacitate where the suit is against co-defendants of whom only one is dead, when the contract was made either with the living co-defendants, or with the living and the dead concurrently;" and for this he cites a number of cases decided in different States. And if that construction is good as applied to the co-contractors on the defendant side of the contract, it is equally good as applied to the co-contractors on the plaintiff side of the contract. In this case, without deciding any proposition broader than the circumstances require, we think Edward M. Hardy was a competent witness, and should have been allowed to testify upon the offer as stated in the fourth exception; and being competent to testify on such offer, *a fortiori* was he competent to testify upon the offer as set out in the eighth exception.

6. The fifth exception taken by the appellants presents a question as to the competency of a witness to give an opinion in respect to the probable conduct of a party holding forged paper with certain defects or marks upon it. The witness, Wilson, though a clerk in the bank, did not profess to be an expert in detecting forgeries, and even if he had professed to be an expert, the question put to him would have been wholly inadmissible. He had described check No. 4374, and referred to certain pencil marks thereon, supposed to have been made for the purpose of tracing, but the tracing was imperfectly done;

and he was then asked by the appellee, whether he thought that a man forging a check would be as apt to present it with an imperfection of that sort upon it, as a man who was writing a genuine signature. This question was objected to by the appellants, but allowed by the Court, to which the appellants excepted. And the witness having answered the question in a manner favorable to the appellee's view, he was then asked to state whether the fact of the double termination of the signature to check No. 4344, and its having been issued with that signature, did not indicate, in his judgment, that the check was genuine, rather than that it was forged. This question was also objected to by the appellants, but was allowed to be answered, and the appellants excepted.

These two exceptions may be disposed of together. The questions objected to did not seek the knowledge of the witness as to the genuineness of the hand-writing of the party supposed to have drawn the checks, but sought to elicit the judgment of the witness as to the degree of prudence or caution that would likely have influenced the conduct of the party drawing the checks if they had been forged. Whether a forger was less likely to present checks with particular marks upon them than otherwise, was a question that the witness was incompetent to answer. The jury were as competent to form their conclusions from the marks and indications on the face of the checks as the witness; and where such is the case the witness is not allowed to give his judgment. *Higgins vs. Carlton,* 28 *Md.,* 115, 137. In the case of *Campbell vs. Richards,* 5 *B. & Ad.,* 846, Lord DENMAN, C. J., said: "Witnesses conversant in a particular trade may be allowed to speak to a prevailing practice in that trade; scientific persons may give their opinions on matters of science, but witnesses are not receivable to state their views on matters of legal or moral obligation, nor on the manner in which others would probably be influenced if

the parties had acted in one ·way rather than in another." The same principle, with many illustrations of its application, is approved in the case of *Milwaukee, etc. R. Co. vs. Kellogg,* 94 *U. S.,* 472, 473. We therefore think there was error in the rulings as stated in these two exceptions.

It results that the judgment below must be reversed, and a new trial ordered.

> ·*Judgment reversed, and*
> *new trial awarded.*

(Decided 18th June, 1879.)